Jess M. Krannich (#14398)
Christopher M. Glauser (#12101)
Mitch M. Longson (#15661)
MANNING CURTIS BRADSHAW & BEDNAR PLLC
136 East South Temple, Suite 1300
Salt Lake City, Utah 84111
Telephone: (801) 363-5678
Facsimile: (801) 364-5678
jkrannich@mc2b.com
cglauser@mc2b.com
mlongson@mc2b.com

*Attorneys for Plaintiffs Ivanti, Inc. and LANDesk Software Singapore Pte., Ltd.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| IVANTI, INC. and LANDESK SOFTWARE SINGAPORE PTE., LTD., <br><br> Plaintiffs, <br><br> v. <br><br> STEPHEN SHEA, <br><br> Defendant. | **VERIFIED COMPLAINT** <br><br> Civil No. _____ <br><br> Judge _____ |

Plaintiffs Ivanti, Inc. and LANDesk Software Singapore Pte., Ltd. (collectively "Ivanti"), through their undersigned counsel, bring this action against Defendant Stephen Shea ("Shea") and allege as follows:

## **INTRODUCTION**

1.      This case arises from Shea's willful and continuing violations of his contractual and legal obligations to Ivanti—actions that amount to a systematic attempt by Shea to raid Ivanti's business relationships in the Asia Pacific ("APAC") region that Shea spent 13 years

1

building, using inside, protected information belonging to Ivanti, all for the sake of tearing down Ivanti's business relationships and good will in the region and converting them to Ivanti's primary competitor, StayLinked Corporation ("StayLinked").

2.       For 13 years, Shea headed up the APAC region of Ivanti's supply chain sales organization, literally building Ivanti's business in that region from scratch into a multimillion-dollar per year sales organization.  As the face of the company in the APAC region, Shea was either the contact point for or aware of nearly all the company's business relationships and account contacts.  He knows the terms and pricing of all of Ivanti's confidential business contracts in the region (and, as discussed below, he even snuck documents containing such protected information out of the company shortly before leaving Ivanti).  He knows and was involved with creating all of the company's sales strategy in the region, including its confidential strategy vis-à-vis competitors like StayLinked (and, again, snuck documents containing such protected information out of the company just prior to his departure).  Shea was integral to Ivanti's development of its business relationships, account contacts, reputation, and good will throughout the APAC region, and Ivanti invested a massive amount of time, effort, and financial resources in supporting Shea.  As Ivanti's face and leader in the APAC region, Shea was placed in a position of trust by Ivanti, and is in a unique position to either protect that trust and his knowledge of Ivanti's entire APAC region business, or to use his unique position and knowledge to tear down the company's good will and relationships in the region.  Unfortunately, Shea has chosen to do the latter.

3.       As befits a high-level employee entrusted with such knowledge and responsibilities, Shea is bound by an employment agreement with Ivanti.  Among other things, it

bars Shea from competing with Ivanti in the APAC region or soliciting Ivanti's business relationships in the region, for a period of 6 months post-separation.  It also protects all sensitive and confidential Ivanti information and knowledge in his possession, and requires Shea to return such information to Ivanti and not use it for his advantage or that of a competitor.

      4.        Despite his continuing employment and high level of compensation with Ivanti, Shea voluntarily resigned his role with the company in November 2017.  Prior to his departure, he told all with whom he worked that he planned to spend the foreseeable future with his elderly parents in California, and had no immediate plans to work in the industry.  Unbeknownst to Ivanti, Shea had actually spent months planning his departure and setting himself up to be StayLinked's exclusive distributor in the APAC region.  And almost immediately after departing Ivanti, Shea embarked on a systematic solicitation tour of Ivanti's most important business relationships throughout the APAC region, leveraging Shea's inside knowledge of all of Ivanti's confidential account contacts, contractual and pricing terms, and sales strategy, and Shea's and Ivanti's good will with those account contacts developed for Ivanti, to set up meetings and then pitch Ivanti's clients on converting their business to StayLinked.  When Ivanti learned of Shea's actions, investigated, and confirmed what Shea is doing, its counsel sent Shea a letter asking that he stop, and comply with his contractual and legal obligations.  In response, Shea not only refused, he admitted his actions, including the solicitation tour and his use of Ivanti's confidential account contacts to get in the door with Ivanti's most important business relationships.  And Ivanti just confirmed that, early next week, Shea will be promoting StayLinked at a significant industry event in Chang Mai, Thailand, hosted by perhaps Ivanti's most important business relationship in the APAC region.

5.      Accordingly, Ivanti brings this action and asks the Court to put a stop to Shea's flagrant violations of Ivanti's rights, which threaten to destroy the good will, reputation, and business relationships in the APAC region that Shea and Ivanti invested so much time, effort, and resources to build.

## PARTIES

6.      Plaintiff Ivanti, Inc. is a corporation formed under the laws of Delaware, with its headquarters and principal place of business in South Jordan, Utah.

7.      Plaintiff LANDesk Software Singapore Pte., Ltd. is a corporation formed under the laws of Singapore, with its principal place of business in Singapore, and is a wholly-owned subsidiary of Plaintiff Ivanti, Inc., and previously a wholly-owned subsidiary of a set of Utah-based entities referred to as LANDesk or the LANDesk Group (collectively, "LANDesk").

8.      Upon information and belief, Defendant Shea is a United States citizen currently residing and domiciled in Chiang Mai, Thailand.  Shea is a former employee of Ivanti and LANDesk (and, prior to that, a contractor for an entity acquired by LANDesk called Wavelink).  All told, Shea provided services to Ivanti and its predecessors for a period of approximately 13 years.  During the time of the events described below, Shea regularly conducted business in, visited, and corresponded with Ivanti (and its predecsssors') management in the State of Utah, as further discussed below.

## JURISDICTION AND VENUE

9.      Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, as this Court has federal question jurisdiction under 18 U.S.C. § 1836 *et seq.*, and has supplemental

jurisdiction over Ivanti's pendent state law claims pursuant to 28 U.S.C. § 1367, as they form

part of the same case or controversy and arise from the same nucleus of operative facts.

10.     Shea has had regular and systematic contacts with Ivanti's headquarters in the

State of Utah throughout all times relevant to this lawsuit.  From 2012 until his separation from

the company in November 2017, Shea was employed by Ivanti and its predecessor LANDesk,

both of which have or had their principal place of business and headquarters in Utah.  Prior to

being employed by LANDesk, Shea provided services to Wavelink, which was also

headquartered in Utah, and was subsequently acquired by LANDesk.  Shea served as Area

Director for Ivanti's supply chain sales organization in the APAC region—one of four LANDesk

regions worldwide—from 2012 until July 2017, then as Strategic Territory Manager for the same

region from July 2017 until his resignation in November 2017.  In his role as Area Director, Shea

was one step removed from the company's Executive Vice President of Global Software Sales,

who runs the company's global sales operations from Ivanti's headquarters in Utah.  Shea

regularly participated in telephone, e-mail, and other correspondence with Ivanti management

and personnel in Utah on topics such as overall strategic planning about products, services,

customers, and competitors; global and regional sales targets; and global and regional sales

performance.  Throughout his tenure with Wavelink, LANDesk, and Ivanti, Shea also

participated in bi-weekly sales strategy calls in which multiple Ivanti employees located at

corporate headquarters in Utah participated (these calls were often organized by the same Utah-

based employees).  Other calls with Utah-based personnel were also common, as were email

communications with Utah-based employees about strategic sales issues.  In addition, Shea

regularly traveled to Utah for Ivanti's annual conference.  Thus, Shea had continuous and

systematic contact with Utah and individuals residing in Utah for approximately 13 years, until his separation from Ivanti in November 2017.

11.     Accordingly, this Court has personal jurisdiction over Shea.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because there is no other district in Utah in which an action may otherwise be brought that would have personal jurisdiction over Shea.

<u>**GENERAL ALLEGATIONS**</u>

**The Ivanti Supply Chain Division's Business Model**

13.     Ivanti is an international IT solutions company that offers user-centered products and services designed to increase user productivity while reducing IT security risk, including supply chain software, products, and services that are used by some of the world's largest supply chains to manage their inventories.

14.     Formerly known as LANDesk, Ivanti was rebranded in early 2017 following the acquisition of another large software company.  Founded in 1985, LANDesk grew over the years, including—for example—through its 2012 acquisition of Wavelink, a provider of supply chain mobility software solutions throughout the world.

15.     Relevant here is Ivanti's supply chain division, which is divided into four sales regions throughout the world, including Ivanti's APAC region, which includes multiple Southeast Asian countries, Australia, and New Zealand.

16.     The vast majority of the Ivanti supply chain division's revenue comes through "reseller agreements" with Ivanti "channel partners."  Ivanti enters into reseller agreements with these channel partners, who in turn provide Ivanti with access to the partners' customers and to

6

device manufacturers, to whom Ivanti sells its supply chain and mobility products and services. For ease of reference, Ivanti hereinafter refers collectively to its channel partners, customers, and device manufacturers as simply "customers," unless otherwise noted.

17.     Ivanti's contacts and relationships with customers are some of Ivanti's most valued assets.  It is through the creation, growth, and maintenance of these relationships that Ivanti generates sales and revenue.  Through the creation and maintenance of such relationships by Area Directors and Strategic Territory Managers throughout the world, Ivanti has become a worldwide leader in mobility solutions for supply chain companies.

18.     Ivanti's relationships with its customers' account contacts are invaluable to the point that Ivanti takes careful steps to ensure that information about those relationships is protected and kept from dissemination into the marketplace.  This is done, for example, by requiring employees to sign reasonable confidentiality, non-competition, and non-solicitation agreements intended to protect such information, ensuring that it is not disseminated to competitors, and by requiring departing employees to return to Ivanti all such information and documentation in their possession.

## Shea's Offer Letter Agreement and Employment with Ivanti

19.     Until his departure from Ivanti in November 2017, Shea worked for Ivanti or its predecessors, LANDesk and Wavelink, for the past 13 years, all in the APAC region.  Shea worked as a contractor for Wavelink in the APAC region until approximately 2012, when he entered into an employment relationship with LANDesk, which was subsequently rebranded as Ivanti in 2017.

7

20.     Throughout his 13 years with the company, Shea sold mobility solutions products to supply chain companies operating throughout the APAC region.  Prior to working with Wavelink, Shea worked in the telecommunications industry, and therefore he came to Wavelink with virtually no industry business contacts or relationships on which to build.  Nevertheless, Shea was extremely successful building Wavelink's business through the creation of valuable channel partner and customer relationships, virtually from the ground up.

21.     Shea excelled not only at identifying and creating profitable business relationships on behalf of Wavelink and later LANDesk and Ivanti, but at maintaining and protecting Ivanti's reputation and good will with Ivanti's customer entities in APAC.  Shea learned, for example, which companies would provide Ivanti with valuable in-roads to customers and device manufacturers, and which key employees within those organizations were appropriate contacts to build lasting, profitable Ivanti partnerships.  Thus, for every "account" in the APAC region, Shea understood the customer's organization sufficient to craft lasting business relationships and maximize sales profitability.  This "account mapping" with Ivanti's customers was one of the most valuable pieces of information Shea was privy to during his tenure with Ivanti, and Ivanti held it closely (through Shea).

22.     On or around October 12, 2012, shortly after Wavelink was acquired by LANDesk, Shea entered into an employment relationship with LANDesk's Singapore-based subsidiary, LANDesk Singapore Pte., Lte. ("LANDesk Singapore"), in which Shea would provide substantially the same services to LANDesk that he had been providing as a contractor for Wavelink.

23.     To facilitate the employment relationship, Shea signed a 12-page offer letter agreement (the "Agreement") with LANDesk Singapore and LANDesk, in which he undertook duties as Area Director for LANDesk in the APAC region.  *See* Agreement (redacted), attached hereto as Exhibit A.  In exchange for compensation in the form of salary, commissions, and benefits, Shea agreed, among other things, to confidentiality, non-competition, and non-solicitation provisions within the Agreement.  *See* Ex. A §§ 13, 14.

24.     Specifically, Shea agreed that he

Shall not, except as authorised by the Company or required by applicable law, reveal to any person, firm or partnership, company, corporation, association, organisation or trust, any and all Confidential Information which may come to [his] knowledge during [his] employment with the Company, and [he] shall keep with complete secrecy the Confidential Information entrusted and/or received by [him] and shall not use or attempt to use any such information in any manner which may injure or cause loss either directly or indirectly to any LANDesk Group Company or its business or may be likely to do so.

*Id.* § 13.1.  "Confidential Information" is defined in the Agreement as "any and all information which is proprietary or confidential to any LANDesk Group Company or which any LANDesk Group Company is required to keep confidential."  *Id.* § 11.5(b).

25.     Shea also agreed that upon termination of his employment, he would "deliver up to the Company all correspondences, drawings, documents and other papers and all other property belonging to the LANDesk Group" in his possession, and "shall not without the written consent of the Company retain any copies thereof."  *Id.*

26.     This provision was critical given the copious amounts of confidential information used by Ivanti's salesforce, and particularly its Area Directors, to build relationships and goodwill, and drive sales through channel partners and direct customers.  Materials like pricing information, confidential contracts with channel partners and customers, product specifications,

strategic planning information (like Ivanti "battlecards," which provide Ivanti salespeople with highly-detailed information about the benefits and weaknesses of Ivanti's portfolio vis-à-vis competitors') are also critical to Ivanti's success.  If not turned over by departing employees like Shea, there is significant risk of irreparable harm from the potential dissemination of such information to Ivanti's competitors.

27.     Ivanti goes to great lengths to preserve the confidentiality of sensitive materials like this, including by adding and enforcing provisions like Section 13 described above in Shea's Agreement, instructing high-level employees like Shea to hold such information closely, using encrypted servers to transfer and store sensitive information, designating materials as confidential or for internal use only, and obligating partners and customers to safeguard any confidential materials they receive in their dealings with Ivanti.

28.     Shea further agreed to non-competition and non-solicitation provisions. Specifically, Shea agreed that he "shall not, at any time during the period of the Employment and *for a period six (6) months after the termination of the Employment* . . ." do any of the following:

    a.   "[D]irectly or indirectly carry on or be engaged or interested in any capacity (whether as shareholder, partner, employee, agent, consultant, **contractor** or otherwise . . .) in any other business, trade or occupation in respect of, any services supplied by the Company and with which your duties were materially concerned or for which you were responsible during the Employment, *or any services of the same type or materially similar to those services ('Restricted Services'), except in a business, trade or occupation which does not compete directly or indirectly with the business of the Company in the Asia Pacific region*;

    b.   have any business dealings with or solicit custom or business from or canvas any customer or prospective customer in respect of Restricted Services;

    c.   solicit or endeavor to solicit the custom of any person who is or has been, at any time during the period of Employment, *a customer of the Company for the*

> ***purpose of offering to such person goods or services similar to or competing with those of the business carried on by the Company*** . . .;

    d.   cause or permit any person directly or indirectly under [his] control to do any of the foregoing acts or things."

*Id.* § 14 (emphasis added).  These provisions did *not* prevent Shea from working for a competitor in a non-APAC region, nor did they prevent him from working in a non-competitive capacity with one of the many Ivanti customers with whom he had become familiar in his 13 years' experience.

      29.    These protections are critical, particularly for employees like Shea, because Area Directors and Strategic Territory Managers provide Ivanti with unique skills and abilities to create, foster, and build upon business relationships and good will in their respective regions, as well as skills in strategic marketing and sales to partners and customers in multiple countries, with varying cultures.  Shea in particular, with his 13 years' experience building Ivanti's business in the APAC region virtually from the ground up, possessed and used these skills during his Ivanti tenure.

      30.    The Agreement was fully executed, including by Shea, on or around October 12, 2012.  *See id.* at 12.

### Shea's Lateral Role Change and Resignation

      31.    In July 2017, Ivanti's Vice President of Worldwide Sales, Steve Bemis, to whom Shea reported, decided that Shea's business development abilities, particularly in Southeast Asia, would best serve the company's needs, and he considered focusing Shea on developing Ivanti's Southeast Asian business in a role as Strategic Territory Manager for the APAC region.  This potential move was considered a lateral shift within the Ivanti sales organization, with Shea

receiving the same base salary, and even more financial upside in terms of potential commissions.

32.     Bemis discussed the change with Shea around this time, and Shea agreed that the move was best for the company and the region, and that it would provide Shea with an opportunity to focus on his business development skills.  Shea never intimated that he saw the role change as a demotion, or somehow disrespectful of his accomplishments with Ivanti for the previous 13 years.  In fact, Shea promised Bemis that he would tackle his new role with as much energy and passion as he had exhibited in his role as Area Director.

33.     In the same discussion with Bemis, Shea suggested that a current Strategic Territory Manager working in Australia and New Zealand, Simon Storey, would be an ideal fit to assume the role of Area Director for the APAC region.  Bemis ultimately agreed, and on or around July 20, 2017, he announced to the region's sales force that Storey would become the Area Director Role for the APAC region, and Shea would become Strategic Territory Manager within that same region, focusing on Southeast Asia.  Shea reiterated to his sales team following the announcement that he was excited about his new role.

34.     Shortly after the change, several Ivanti supply chain division employees were scheduled to attend a meeting in Lake Tahoe, Nevada in early August.  Shea was originally scheduled to attend the meeting, but because Bemis knew Shea's parents were in poor health, Bemis offered for Shea to skip the Lake Tahoe meeting and instead spend time with his parents in the Bay Area.  Shea accepted this offer and purportedly visited his parents instead of attending the Lake Tahoe meeting.  As discussed below, Ivanti later learned that Shea used this trip to meet

with one of Ivanti's primary competitors, StayLinked, to discuss Shea promoting StayLinked in the APAC region.

36. Shea worked in his new role without complaint for approximately three months. During this time, Shea earned significant sales and commissions. Shea also continued to develop Ivanti's business contacts in the APAC region.

36. On October 4, 2017, without warning, Shea submitted his resignation as Strategic Territory Manager via email to Storey and Bemis. As reasons for his decision to leave Ivanti, Shea cited his parents' poor health and the fact that he intended to oversee their ongoing care, and the fact that Shea apparently no longer wanted to work in his role as Strategic Territory Manager. Shea requested that he be released of his duties effective upon the lapse of "whatever is in my employee contract as notification period." Shea never suggested in his resignation email that he felt disrespected by his change to Strategic Territory Manager, or viewed the change as a demotion.

37. In subsequent telephone conversations, Shea confirmed his reasons for leaving Ivanti. Shea implied that he no longer intended to work, but admitted he may for financial reasons return to work at some point in the future, once his family situation settled down, at which point Shea expressed interest in potentially distributing Ivanti products once again in some capacity.

38. Because the Agreement provided for a 30-day resignation notice period, Ivanti informed Shea that his last day at Ivanti would be November 3, 2017. Shea requested permission to take personal leave for the balance of his notice period in order to spend more time with his parents in California. Ivanti allowed Shea to take his personal leave and, but for some minimal

13

monitoring of APAC accounts for the final three weeks of his employment, Shea finished his Ivanti tenure on leave status.

39.     Storey was tasked with transitioning Shea out of his role and replacing Shea in the APAC region.  As part of this process, Storey sought to obtain, pursuant to Shea's Agreement, all confidential, sensitive, or otherwise protected information from Shea.  For example, Storey asked Shea to place all Ivanti files needed to ensure a successful transition into a Dropbox folder, delete the rest, and to assist Storey with transitioning Shea's knowledge and information concerning all Ivanti business relationships in the APAC region by completing an "account mapping" for each customer.  Storey even offered to fly to Chang Mai, Thailand, to meet with Shea to do this in person, and when Shea declined, Storey sent Shea a spreadsheet to complete the account mapping.

40.     The account mapping information Storey requested was critical both to continue building on the work Shea had done in the APAC region with Ivanti's customers, but also to ensure Shea did not use that valuable and protected information to somehow undermine the progress Ivanti had made with its partners and customers in the region.

41.     Shea resisted sending this information to Storey, claiming it was either too complicated, that there wasn't much information, or that he was busy taking care of his family obligations.  Storey requested the information repeatedly to no avail.  Despite Storey's offer to meet with Shea personally to discuss and facilitate the transfer of information, Shea declined, and he likewise refused to complete the spreadsheet Storey provided to him.

42.     Finally, shortly before his last day on November 3, 2017, Shea emailed Storey several photographs of business cards, supposedly representing all of Shea's significant contacts

in the region.  Storey requested that Shea provide the physical business cards to him, but Shea

refused, claiming he may want them at some point in a "future life."  The business card

photographs did not provide the critical account mapping information Storey had been seeking

since beginning Shea's transition process.

43.     Shea also placed just over 900 files into the Dropbox folder Storey had

designated, but this was dramatically fewer documents than Storey expected given Shea's 13

years of work history.  Indeed, there were glaring time gaps in the files, which were comprised of

documents from prior to 2009, when Shea was with Wavelink, and documents from the time

Shea became Strategic Territory Manager forward—a period of only a few months.  In other

words, Shea had failed to turn over virtually all of his documents from the time period during

which he served as Area Director in the APAC region.

44.     Finally, several days after his last day at Ivanti, Shea returned his Ivanti Macbook

to Storey and asked that he be able to retain his prior laptop that he had used as Area Director.

Storey accepted the new Macbook and permitted Shea to keep his old Macbook, presuming Shea

had deleted and/or placed in the Dropbox any sensitive or confidential Ivanti information, as

Storey had requested.

**Shea's Breaches of the Agreement and Other Unlawful Acts**

45.     Shortly after Shea's last day at Ivanti, in mid-November 2017, Ivanti employees

in the APAC region, including Storey, began receiving reports that Shea had been contacting

Ivanti's customers in the APAC region on behalf of StayLinked, one of Ivanti's primary

competitors in the global supply chain solutions arena.

46.     Ivanti received these reports from numerous business contacts in the APAC region, including from some of Ivanti's largest and most profitable customers.  Ivanti's customers reported that Shea was using his good will with Ivanti to set up meetings, using the same network of account contacts he built at Ivanti, and then using the meetings to promote StayLinked products and services that directly compete with Ivanti's supply chain portfolio. Shea held such meetings, or sought to set up such meetings, with significant Ivanti customers in at least Australia, New Zealand, Singapore, and Thailand.  Perhaps not coincidentally, prior to his resignation, Shea had been previously scheduled to be in these regions on behalf of Ivanti. Instead, Shea embarked on a systematic tour of the same countries and business entities on behalf of StayLinked.

47.     Shea denigrated Ivanti and its products during the meetings, and attempted to persuade Ivanti's customers to switch to StayLinked's supply chain products and services.  Ivanti customers reported being confused why Shea—whom all of these contacts knew well from his years of work for Ivanti—was now pitching competing StayLinked products.  Some customers even reported meeting with Shea under the assumption he was still selling Ivanti products, then being embarrassed to realize the bait-and-switch Shea had pulled to set up the meeting on behalf of an Ivanti competitor.

48.     Storey received reports of Shea's meetings, or attempts to meet, on behalf of StayLinked from many of Ivanti's most significant customers in Australia, New Zealand, Singapore, and Thailand.  These reports came from the very individuals who met with Shea and listened to him pitch StayLinked's products and denigrate the company he had just left and its products.

49.     On information and belief, including information received from Ivanti customers in the APAC region, Shea used sensitive, confidential information belonging to Ivanti, such as critical pricing information and highly confidential Ivanti "battlecards"—which summarized at a high level of detail Ivanti's products' strengths and weaknesses in comparison with StayLinked's products—during his presentations to Ivanti customers throughout the APAC region.  Ivanti believes this because its customers have reported Shea highlighting purported weaknesses in Ivanti's portfolio compared to StayLinked's, and offering better pricing terms.

50.     Shea also used his inside knowledge of Ivanti's account mapping, and his good will with contacts inside Ivanti's customer organizations, to contact and set up the meetings with key employees.  Without the contacts and account mapping he had acquired while at Ivanti, it would have been impossible for Shea to approach the key individuals from these organizations about discussing StayLinked products.  Nor could StayLinked have accomplished these meetings on its own; for example, StayLinked's presence in Southeast Asia is currently minimal, and Staylinked has represented publicly that it is trying to make inroads in the region based on Shea and his history in the region with Ivanti.  The in-roads and goodwill Shea had built while at Ivanti, as well as the knowledge of which employees in the organizations should be targeted for a sales pitch, were the foundation of Shea's StayLinked "tour" of Ivanti's customers.

51.     Reports of Shea's activities in the APAC region after leaving Ivanti were shocking to the colleagues he left at Ivanti.  Indeed, Shea had represented on several occasions, to multiple Ivanti employees, that he intended to take time off to be with his aging parents, and that he only intended to return to work—if at all—when his family situation settled down.  Instead, Shea began his raid of Ivanti's customer base almost immediately after leaving Ivanti.

17

52.     Further, Shea knew he was bound by the non-competition/non-solicitation/confidentiality provisions in the Agreement, given that he referenced the same Agreement when submitting his resignation a month prior.  Shea nonetheless decided to disregard these binding obligations in his Agreement.

53.     While Ivanti's investigation of Shea's solicitations was ongoing, reports of Shea's conduct in the APAC region were confirmed in mid-December 2017, when StayLinked publicly announced that Shea had created his own entity, Link SC, which was now StayLinked's exclusive distributor in the same APAC region where Shea had spent the previous 13 years building Ivanti's business.  StayLinked, which had very little presence in the APAC region aside from in predominantly English-speaking countries, even touted Shea's history working for Ivanti and Wavelink in the APAC region, including that he had spent 13 years successfully building those entities' supply chain businesses in the region.  *See* https://www.prnewswire.com/news-releases/staylinked-accelerates-expansion-in-asiapac-announces-distribution-agreement-with-singapore-based-link-sc-300571393.html ("Most recently with Ivanti and LANDesk, Shea was crucial in building and developing a multi-million-dollar operation in the region.").

54.     At least one Ivanti employee in whom Shea confided before leaving confirmed that Shea started Link SC to compete with Ivanti, and that the employee believed he had planned to do so for months.  Indeed, Ivanti has since learned that Shea met with StayLinked in early August in California, during the same trip in which Shea purported to be visiting his parents in lieu of attending Ivanti meetings in Lake Tahoe.

55.     Thus, while still an Ivanti employee, collecting substantial salary and commissions—and even while on personal leave generously provided by Ivanti—Shea had

already begun his plans to systematically dismantle the 13 years of progress he had made in the APAC region on Ivanti's behalf.  The same employee who confirmed this information exchanged communications with Shea in mid-December 2017, in which Shea said he had been in "stealth mode" for the past month, but was now working full force with his new entity, Link SC, to promote StayLinked.

56.     Further confirming that Shea began the process of transitioning to Link SC and StayLinked long before he left Ivanti, emails recovered from Shea's Ivanti email account reveal that Shea transferred several extremely sensitive and confidential documents and communications to his personal Gmail account within a matter of days after announcing his resignation on October 4, 2017.

57.     For example, on October 5, 2017—the day after his announcement—Shea emailed himself a "StayLinked Battlecard" detailing the strengths and weaknesses of Ivanti's products vis-à-vis StayLinked's competing products, and providing its reader with mechanisms and strategies to highlight Ivanti products' strengths and focus the customer on StayLinked's products' weaknesses.

58.     Similarly, on October 12, 2017, Shea forwarded to his Gmail account a highly-confidential contract with one of Ivanti's largest APAC region customers, as well as an email detailing the company's 2018 "Sales Kick Off" in Thailand.  Ivanti recently learned that Shea is currently scheduled to attend the two-day Sales Kick Off advertised in the email on January 29 and 30, 2018 in Chiang Mai, Thailand, to promote StayLinked.

59.     Ivanti has also discovered since several instances in which Shea reached out to his most important Ivanti customer contacts in the APAC region, expressing his appreciation for

their relationship, then stating that he will "be in touch" in the near future and looks forward to

working with them soon in other endeavors.  All of these contacts occurred before Shea's last

day with Ivanti on November 3, 2017.

**Ivanti's Cease and Desist Letters and Shea's Response**

60.    After learning from its customers of Shea's blatant breaches of his Agreement and

misappropriation and use of sensitive information, and given the substantial and irreparable harm

that may result if Shea continues, Ivanti sent Shea a cease-and-desist letter reminding him of his

contractual obligations and requesting that he cease his work for StayLinked, solicitation of

Ivanti's customers, and use of confidential Ivanti information.  Ivanti sent its letter on January

12, 2018, requesting that Shea respond by January 19, 2018, to inform Ivanti if he would

comply.

61.    Shea responded to Ivanti's Cease and Desist letter on January 17, 2018.  In his

response, he flatly refuses to comply with Ivanti's requests that he honor his contractual

obligations.  *See* Shea Response, attached hereto as Exhibit B.  Shea does not dispute that he is

acting in violation of the Agreement, and in fact "acknowledge[s] that [his work with Link SC] is

an 'indirect' form of competition to Ivanti/Wavelink."  *Id.*  In reality, promoting StayLinked is a

direct violation of Shea's Agreement, but, either way, Shea has admitted he is in breach.  Shea

also acknowledges his participation in the "mini tour initiated by StayLinked," during which he

solicited Ivanti's customers throughout the APAC region.  *Id.*

62.    The primary reason Shea provides for his refusal to comply is that he believes

"the market deserves to have a choice and that is what I'm trying to provide in Asia Pacific."  *Id.*

Shea also argues that he is not employed by StayLinked, but is an independent distributor, and

20

that he hasn't used Ivanti's confidential information to assist StayLinked. *Id.* Shea then admits, however, that he continues to possess and use information "developed and built in friendships and relationships with partners and customers in this market," which he admits is "valuable information" but claims is "[his] personal asset[,] not Ivanti/Wavelink's." *Id.* This is precisely the confidential account mapping information Ivanti tried to work with Shea to transition prior to his departure. All such information in Shea's possession was developed on Ivanti's and its predecessors' behalf; Shea had no such contacts in the industry before working for Ivanti and its predecessors.

63.     Shea also explains the basis for his decision to leave Ivanti, which is wholly undermined by his contemporaneous conduct and representations. Shea explains that he was "demoted" to Territory Sales Manager in the fourth quarter of 2017, which "brought shame to [his] reputation which Asians consider very highly." *Id.* Shea's characterization of his shift to the Strategic Territory Manager role is both inaccurate and undercut by his own enthusiasm for the change only months before, his acceptance of the position, and his recommendation of Storey to become the new Area Director.

64.     Shea argues the "only other global company in the industry is Staylinked and they have a very minor market share compared to the monopoly strength of Ivanti/Wavelink." *Id.* Shea does not explain why he could not simply work for an Ivanti customer, or other non-competitive entity, or simply wait the reasonable six-month period before engaging with StayLinked. And while Shea claims he needs to continue to work to earn a living, he fails to acknowledge that *he* resigned from Ivanti, while working in a position for which he was well suited and in which he was able to earn more money than he had as Area Director.

65.     In the week following Shea's refusal to comply with Ivanti's requests and his Agreement, Shea's work to undermine and dismantle Ivanti's partner and customer network has continued.  On January 24, 2018, StayLinked announced on LinkedIn that Shea was currently attending a conference of one of Ivanti's significant business partners in Japan, and that the company's CEO had presented Shea with a "Recognition Award."

66.     In addition, as referenced above, Shea is currently scheduled to promote StayLinked at one of Ivani's most significant channel partner's 2018 conference in Thailand on January 29 and 30, 2018.  Thus, Shea has made abundantly clear his intention to continue soliciting Ivanti's customers and using protected information, all in violation of provisions of his Agreement by which he admits he is bound, and which even Shea admits he is breaching.

### FIRST CLAIM FOR RELIEF
### Breach of Contract

67.     Ivanti hereby incorporates by reference all preceding allegations of this Complaint as though fully set forth herein.

68.     The Agreement is a valid and enforceable contract between Shea and Ivanti or its predecessors and subsidiaries, and under which Ivanti and all predecessors or subsidiaries have performed and satisfied all obligations owing to Shea.

69.     Shea has breached at least the following provisions of the Agreement:

a.  Section 11.5(b).  Shea has failed to "deliver up to the Company" all requested materials, whether "Confidential Information" or otherwise, including but not limited to account mapping information for the APAC region, business contacts for the APAC region, Ivanti/LANDesk/Wavelink non-email files for the time period 2010–July 2017, all Ivanti/LANDesk/Wavelink emails, and Confidential

Information as defined in the Agreement, including but not limited to pricing information, Ivanti "battlecards," and confidential Ivanti contracts.

b. Section 14.1(a).  This provision expressly requires Shea to refrain from directly or indirectly, including as a contractor, performing the same work he performed for Ivanti for a competitor within a six-month period after leaving Ivanti.  *See* Ex. A. Contrary to this obligation, Shea has performed the same type of work he performed for Ivanti on behalf of StayLinked in the APAC region within six months of leaving Ivanti.  Shea admits to "indirectly" competing with Ivanti in the APAC region on behalf of StayLinked in violation of this provision immediately after leaving Ivanti.  *See* Ex. B.  StayLinked's announcements concerning Link SC confirm that Shea is performing substantially the same services for StayLinked as Shea performed for Ivanti, and using the sales network Shea built for Ivanti to do so.  *See* https://www.prnewswire.com/news-releases/staylinked-accelerates-expansion-in-asiapac-announces-distribution-agreement-with-singapore-based-link-sc-300571393.html ("Most recently with Ivanti and LANDesk, Shea was crucial in building and developing a multi-million-dollar operation in the region.").

c. Sections 14.1(b) and (c).  These provisions expressly prohibit Shea form soliciting Ivanti's existing or prospective customers with regard to any "Restricted Services."  *See* Ex. A.  Numerous Ivanti customers and channel partners have reported that Shea has approached them regarding StayLinked products, and even denigrated Ivanti products and pricing in an effort to persuade those customers to

switch to using StayLinked products.  Shea has similarly admitted to violating

these provisions while participating in a "mini tour initiated by StayLinked" only

days after he left his employ at Ivanti.  *See* Ex. B.

d.  Sections 13.1–13.2.  These provisions expressly prohibit Shea from retaining and

using any confidential information for his own purposes at any time following his

employment with Ivanti.  *See* Ex. A.  Shea's failure to return vast portions of his

Ivanti/LANDesk/Wavelink files, failure to transition his account mapping,

business contacts, and pricing information, and transfer of critically-sensitive

Ivanti documents to his personal Gmail account only days after submitting his

resignation notice, demonstrate that Shea has retained Ivanti Confidential

Information in violation of the Agreement.  On information and belief, Shea has

used and misappropriated this and other confidential information in soliciting

Ivanti partners and customers in the APAC region.

70.  As a result of Shea's ongoing breaches, Ivanti has sustained and will continue to

sustain damages, including but not limited to a loss of or harm to customer and business partner

relationships, reputation, and goodwill; loss of business, sales, and revenue with the same

customers and business partners; dissemination of confidential information to Ivanti competitors,

business partners, and customers; and loss of competitive advantage in the APAC region supply

chain marketplace.

71.  Shea's breaches have caused, and will continue to cause, irreparable harms to

Ivanti in ways that cannot be reasonably ascertained or quantified.  Shea's breaches have also

caused, and will continue to cause, damages to Ivanti in an amount to be proven at trial.

**SECOND CLAIM FOR RELIEF**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**

72.    Ivanti hereby incorporates by reference all preceding allegations of this Complaint as though fully set forth herein.

73.    The Agreement includes an implied covenant of good faith and fair dealing.

74.    That covenant required Shea to do nothing to undermine Ivanti's reasonable expectations in receiving the benefit of its bargain in entering into the Agreement with Shea, and by fully performing thereunder.

75.    Ivanti and Shea entered into the Agreement so that Ivanti could build upon the success Shea had in the APAC region for Wavelink.  Ivanti sought to use Shea's business development and sales skills to expand its customer network, reach additional supply chain customers, and ultimately increase revenue.  Shea's years of success doing so for Wavelink substantiated the generous salary, commissions, and benefits provided in the Agreement.

76.    Given the significant trust it placed in Shea, Ivanti also sought to retain the benefits of Shea's employment, skills, and business network by imposing reasonable restrictions on Shea's ability to solicit Ivanti customers and directly or indirectly compete with Ivanti in the APAC region.  Ivanti also sought to protect any confidential and proprietary information Shea obtained while employed by Ivanti.

77.    Shea breached both the Agreement and his implied covenant of good faith and fair dealing by engaging in the conduct described above, thus disrupting Ivanti's reasonable expectations in receiving the benefit of its bargain under the Agreement.

78.     Shea's breaches have caused, and will continue to cause, irreparable harms to Ivanti in ways that cannot be reasonably ascertained or quantified.  Shea's breaches have also caused, and will continue to cause, damages to Ivanti in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
### Breach of the Duty of Loyalty

79.     Ivanti hereby incorporates by reference all preceding allegations of this Complaint as though fully set forth herein.

80.     As Area Director, and later as Strategic Territory Manager, Shea owed a fiduciary duty of loyalty to Ivanti, which includes the duty to exercise the utmost good faith and loyalty toward Ivanti in the performance of his duty and to not act in any manner inconsistent with his employment.

81.     Shea has breached his duty of loyalty to Ivanti by unlawfully obtaining and refusing to return confidential and proprietary Ivanti information, as described above.

82.     Shea has also breached his duty of loyalty to Ivanti by taking actions inconsistent with his employment at Ivanti.  In particular, Shea took substantial steps to create a competing entity, Link SC, and to join forces with a primary competitor, StayLinked, months before he left his employ at Ivanti.  In addition, Shea gathered information regarding customers and business partners with the intent to solicit those same customers, contrary to his Agreement, prior to leaving his employ at Ivanti, and while still receiving substantial pay and benefits from Ivanti.

83.     As a direct and proximate result of Shea's breaches, Ivanti has been damaged in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF
### Violation of the Federal Defense of Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*

84.     Ivanti hereby incorporates by reference all preceding allegations of this Complaint as though fully set forth herein.

85.     Ivanti enjoys an advantage over existing and would-be competition in the supply chain solutions marketplace, particularly in the APAC region, by virtue of the confidential information it has compiled over years of employee effort and investment of substantial amounts of capital.  This information belongs to Ivanti, and Ivanti retains the legal right to its ownership and use.

86.     Such confidential and proprietary information includes business contacts, account mapping, customer lists, pricing information, strategic sales and marketing documents, confidential agreements and contracts with customers, and "battlecards," as described above.

87.     This information constitutes trade secrets under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*.

88.     Ivanti has taken extensive steps to preserve the confidential and proprietary nature of this information, including by adding and enforcing provisions like Section 13 described above in Shea's Agreement into employee contracts, using encrypted servers to transfer and store sensitive information, designating sensitive or proprietary materials as confidential or for internal use only, instructing high-levels with access to such information, like Shea, to hold it closely, and obligating partners and customers to safeguard any confidential materials they receive in their dealings with Ivanti.

89.     Shea has acquired these trade secrets by improper means by breaching his explicit duty to maintain their secrecy, as provided in the Agreement, and to return any such information as requested by Ivanti upon his resignation.  *See* Ex. A §§ 13.1–13.2.  Shea has also unlawfully

transferred confidential documents designated for internal use only to his personal Gmail account.

90.     Shea has also improperly disclosed and used Ivanti's trade secrets in the course of his work on behalf of StayLinked, without Ivanti's express or implied consent.  Shea has participated in a "mini tour" on behalf of StayLinked, during which he has unlawfully exploited his extensive and—as Shea admits "valuable"—account mapping and business contacts acquired during his employment at Ivanti, and which he failed to return to Ivanti upon leaving.  Further, on information and belief, Shea has used pricing information, product specifications, battlecards, and confidential Ivanti contracts in the course of his solicitations of Ivanti customers, all of which constitutes unlawful disclosure or use.

91.     All of the foregoing acts occurred after the enactment of the federal Defense of Trade Secrets Act, beginning in or around October 5, 2017, and on information and belief, they continue today.

92.     Shea knew at the time of his acquisition, use, and disclosure of Ivanti trade secrets that the trade secrets were acquired under circumstances giving rise to a duty to maintain their secrecy and/or limit or prohibit their use.

93.     Shea's acquisition, use, and disclosure of Ivanti trade secrets has caused, and continues to cause, Ivanti irreparable damages that cannot be reasonably ascertained.  These include, but are not limited to loss of or harm to customer and business partner relationships, reputation, and goodwill, and loss of competitive advantage in the APAC region supply chain marketplace.  Shea's violations have also caused, and will continue to cause, damages to Ivanti in an amount to be proven at trial in the form of lost sales and revenue.

94.     Shea's misappropriations of Ivanti's trade secrets are and continue to be willful and malicious.  Ivanti has notified and reminded Shea of his obligations under the Agreement to both return confidential information and refrain from using such information in competition with Ivanti, but, on information and belief, Shea continues to nevertheless use and disclose Ivanti's protected information in his solicitations on behalf of StayLinked.

### FIFTH CLAIM FOR RELIEF
### Violation of the Utah Uniform Trade Secrets Act, Utah Code Ann. § 13-24-1 *et seq.*

95.     Ivanti hereby incorporates by reference all preceding allegations of this Complaint as though fully set forth herein.

96.     Ivanti enjoys an advantage over existing and would-be competition in the supply chain solutions marketplace, particularly in the APAC region, by virtue of the confidential information compiled over years of effort and investment of substantial amounts of capital.  This information belongs to Ivanti, and Ivanti retains the legal right to its ownership and use.

97.     Such confidential and proprietary information includes business contacts, account mapping, customer lists, pricing information, strategic sales and marketing documents, confidential agreements and contracts with customers, and "battlecards," as described above.

98.     This information constitutes trade secrets under the Utah Uniform Trade Secrets Act, Utah Code Ann. § 13-24-1 *et seq.*

99.     Ivanti has taken extensive steps to preserve the confidential and proprietary nature of this information, including by adding and enforcing provisions like Section 13 described above in Shea's Agreement into employee contracts, using encrypted servers to transfer and store sensitive information, designating sensitive or proprietary materials as confidential or for internal use only, instructing high-levels with access to such information, like Shea, to hold it closely,

and obligating partners and customers to safeguard any confidential materials they receive in their dealings with Ivanti.

100.    Shea has acquired these trade secrets by improper means by breaching his explicit duty to maintain their secrecy, as provided in the Agreement, and to return any such information as requested by Ivanti upon his resignation. *See* Ex. A §§ 13.1–13.2. Shea has also unlawfully transferred confidential documents designated for internal use only to his personal Gmail account, which he did only one day after announcing his resignation from Ivanti.

101.    Shea has also unlawfully misappropriated Ivanti's trade secrets in the course of his work on behalf of StayLinked, without Ivanti's express or implied consent. Shea has participated in a "mini tour" on behalf of StayLinked, during which he has unlawfully exploited his extensive and—as Shea admits "valuable"—account mapping and business contacts acquired during his employment at Ivanti, and which he failed to return to Ivanti upon leaving. Further, on information and belief, Shea has used pricing information, product specifications, battlecards, and confidential Ivanti contracts in the course of his solicitations of Ivanti customers, all of which constitutes unlawful disclosure or use.

102.    Shea knew at the time of his misappropriation of Ivanti trade secrets that the trade secrets were acquired under circumstances giving rise to a duty to maintain their secrecy and/or limit or prohibit their use.

103.    Shea's acquisition, use, and disclosure of Ivanti trade secrets has caused, and continues to cause, Ivanti irreparable damages that cannot be reasonably ascertained. These include, but are not limited to loss of or harm to customer and business partner relationships, reputation, and goodwill, and loss of competitive advantage in the APAC region supply chain

marketplace.  Shea's violations have also caused, and will continue to cause, damages to Ivanti in an amount to be proven at trial in the form of lost sales and revenue.

104.    Shea's misappropriations of Ivanti's trade secrets are and continue to be willful and malicious.  Ivanti has notified and reminded Shea of his obligations under the Agreement to both return confidential information and refrain from using such information in competition with Ivanti, but, on information and belief, Shea continues to nevertheless use and disclose Ivanti's protected information in his solicitations on behalf of StayLinked.

### SIXTH CLAIM FOR RELIEF
### Intentional Interference with Economic Relations

105.    Ivanti hereby incorporates by reference all preceding allegations of this Complaint as though fully set forth herein.

106.    Shea has intentionally interfered with Ivanti's economic relations by procuring confidential and sensitive information for the purpose of competing with Ivanti by engaging in direct and indirect competition with Ivanti in his work with Link SC and StayLinked; soliciting current and prospective Ivanti customers; and by using confidential Ivanti information in the course of engaging in these acts, all in violation of the Agreement, Shea's common law duty of loyalty, the federal Defense of Trade Secrets Act, and/or the Utah Uniform Trade Secrets Act.

107.    The means by which Shea interfered with Ivanti's economic relations with its customers and business partners were and are improper, and contrary to the established standards of the industry, federal and state statute, common law, and/or Shea's Agreement.

108.    As a direct and proximate cause of Shea's actions, Ivanti has been damaged in an amount to be determined at trial, plus punitive damages and attorneys' fees for Shea's willful and malicious conduct.

## INJUNCTIVE RELIEF

109.    Ivanti hereby incorporates by reference all preceding allegations of this Complaint as though fully set forth herein.

110.    Because of the irreparable harm Ivanti will likely suffer by means of Shea's continuing breaches, Ivanti seeks and is entitled to an injunction prohibiting Shea's on-going breaches pending final resolution of Ivanti's claims.  By virtue of the foregoing, Ivanti has demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against Shea.

111.    Unless Shea is preliminarily and permanently enjoined from the foregoing conduct, Ivanti will be irreparably harmed by (1) a loss of or harm to customer and business partner relationships; (2) loss of or harm to Ivanti's reputation among its business partners and customers; (3) harm to the years' worth of goodwill fostered by Ivanti among its channel partners and customers; (4) dissemination and misappropriation of Ivanti's confidential information and trade secrets, including to its primary competitors, customers, and channel partners; and (4) loss of competitive advantage in the APAC region supply chain marketplace.

112.    Ivanti has no other adequate remedy at law for the above harms.

## PRAYER FOR RELIEF

WHEREFORE, by virtue of the foregoing acts complained of, Ivanti demands the following relief:

113.    A judgment in its favor on Counts I, II, IV, and V permanently enjoining Shea.

114.    Issuance of a temporary restraining order and/or preliminary injunction binding until a final resolution of Ivanti's claims, enjoining Shea from competing, directly or indirectly,

in the APAC region in which he worked while at Ivanti/LANDesk/Wavelink for a period of six months from the time the injunction is entered; solicitation of Ivanti supply chain customers or prospective Ivanti supply chain customers in the APAC region for a period of six months from the time the injunction is entered; retaining, using, or disclosing any and all Ivanti confidential information and/or trade secrets; and any other such acts as the Court deems appropriate for injunctive relief.

115.    On Counts I, II, III, IV, V, and VI, for a monetary judgment against Shea in Ivanti's favor in an amount to be proven at trial.

116.    The costs and attorneys' fees Ivanti incurred with respect to this action.

117.    All other relief the Court may deem appropriate under the circumstances.

Dated: January 26, 2018

Respectfully submitted,

/s/ Jess M. Krannich

_____

Jess M. Krannich (#14398)
Christopher M. Glauser (#12101)
Mitch M. Longson (#15661)
MANNING CURTIS BRADSHAW &
BEDNAR PLLC
136 East South Temple, Suite 1300
Salt Lake City, Utah 84111
Telephone: (801) 363-5678
Facsimile: (801) 364-5678
jkrannich@mc2b.com
cglauser@mc2b.com
mlongson@mc2b.com

*Attorneys for Plaintiffs Ivanti, Inc. and
LANDesk Software Singapore Pte., Ltd.*

## VERIFICATION

I, Stephen Bemis, am the Vice President of Worldwide Sales for Plaintiff Ivanti, Inc.  I hereby verify that the facts alleged in this Verified Complaint are true and correct, except for those stated on information and belief, which I believe to be true.  I declare under penalty of perjury pursuant to the laws of the United States and the State of Utah that the foregoing is true and correct to the best of my knowledge.

Stephen Bemis

1 – 26 – 2018
Date

35